

**SO ORDERED.**

**SIGNED this 23 day of October, 2012.**

*Stephani W. Humrickhouse*

_____

**Stephani W. Humrickhouse**
**United States Bankruptcy Judge**

_____

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### WILMINGTON DIVISION

IN RE:                                                    CASE NO.

**SEA TRAIL CORPORATION**                    **11-07370-8-SWH**

  DEBTOR

## ORDER CONFIRMING PLAN

This case came before the court for a hearing on confirmation of the debtor's First Amended Plan of Reorganization on September 20, 2012, in Raleigh, North Carolina.  Objections to confirmation were filed by the Bankruptcy Administrator and the Unsecured Creditor's Committee (the "Committee").  Upon the conclusion of the hearing, the court took the matter under advisement. On September 24, 2012, the court entered a separate order notifying the parties of its ruling confirming the Plan.  This order sets out the bases for the court's decision.

## BACKGROUND

The debtor filed a petition for relief under Chapter 11 of the United States Bankruptcy Code (the "Code") on September 27, 2011.  The debtor owns and operates a vacation and residential resort in Sunset Beach, North Carolina, known as the Sea Trail Golf Resort and Conference Center.  On January 16, 2012, Waccamaw Bank (the "Bank"), the primary secured creditor of the debtor, filed a motion for relief from stay, or in the alternative, for adequate protection.  When the petition was

filed, the Bank held senior liens on the vast majority of the debtor's real estate, including the debtor's golf courses, convention center buildings, developed residential lots and undeveloped real estate. The debtor, the Bank and the Committee agreed to terms regarding the Bank's stay motion, which terms were incorporated into an Agreed Order Allowing Relief from the Automatic Stay and Adequate Protection to Waccamaw Bank (the "Agreed Order") entered on February 16, 2012.

Pursuant to the Agreed Order, the Bank released a portion of its collateral from its lien for the benefit of the debtor and unsecured creditors.[1] The collateral released is identified in the Agreed Order as the "Carve-Out Property." The Carve-Out Property consists of 19.53 acres of undeveloped real estate identified as Tract 16, a five acre sewer facility abutting Tract 16, 180 sewer taps, a sewer service agreement, and $31,472.42 of proceeds from the sale of the debtor's property known as 390 Magnolia Drive SW.

On January 26, 2012, the debtor filed its initial plan of reorganization. On March 13, 2012, the Bank and the Committee objected to the plan on various grounds. On May 22, 2012, the debtor filed its First Amended Plan of Reorganization (the "Plan"), which is before the court for confirmation. The Plan establishes sixteen classes:

> (1) administrative claims; (2) ad valorem tax claims; (3) other tax claims; (4) the secured claims of Waccamaw Bank; (5) the secured claim of John & Frances Williams; (6) the lease agreements with Agricredit Acceptance, LLC; (7) all executory contracts and leases not separately classified; (8) the sewer service agreement with Brunswick County; (9) the lease agreements with DeLage Landen

---

[1] The Agreed Order also provides that the automatic stay shall be lifted as to the Bank if the debtor's reorganization plan is not confirmed on or before April 30, 2012. Upon the lifting of the stay, the Bank has sole discretion to proceed with a foreclosure sale against its collateral. The Bank also waives its unsecured deficiency claim, unless a plan is not confirmed or the debtor's case is converted to a Chapter 7 liquidation. The debtor's plan was not confirmed by the deadline and the stay has been lifted. However, the Bank has not proceeded with foreclosure and has agreed to waive its deficiency claim in conjunction with confirmation of the Plan.

Financial; (10) the investment advisory agreement with The Plasencia Group, Inc.; (11) the lifetime golf membership agreements; (12) the claims asserted by the Master Association; (13) the general unsecured claims of less than $1,000; (14) the general unsecured claims greater than $1,000; (15) the general unsecured claims arising from shareholder loans; and (16) the equity interests of the debtor's shareholders.

Objections to the Plan were filed by the Bankruptcy Administrator and the Committee. The Bankruptcy Administrator contends that the treatment of Class 1 violates Section 1123(a)(4) of the Code because members within that class are treated differently, i.e., the payment of the claims of some members of that class are guaranteed by the Bank, while others are not. The Bankruptcy Administrator also cites her concerns that the absolute priority rule set forth in Section 1129(b)(2)(B) of the Code must be satisfied if the unsecured class objects to the Plan. Finally, the Bankruptcy Administrator contends that the Plan unfairly discriminates against the Class 14 creditors because Class 15 creditors receive more advantageous treatment under the Plan, and that by virtue of the "junior" status of Class 15, such treatment may also violate the absolute priority rule.

The Committee also objected to the treatment of the unsecured classes, stating that the Plan "offers different treatment to like claims and fails to subordinate inside claims, instead giving them preferential treatment, all in violation of Sections 1122, 1123 and 1129." The Committee argues that such treatment also violates "the doctrine of equitable subordination and the absolute priority rule."

Prior to the confirmation hearing, the debtor submitted a Summary of Ballots and then a Supplement to Summary of Ballots. The ballot reports indicate that there were no ballots cast in Classes 1, 7, 10 and 11;[2] that Classes 2, 3, 6, and 8 were given unimpaired treatment and thus

---

[2] Class 7 claims are treated in Classes 13 and 14; the Class 10 creditor has asserted no claim; although the ballot report shows no ballots cast, in fact accepting ballots were cast and Class 11 will be treated as an accepting class.

deemed accepting classes;[3] that Classes 4, 9, 12, 13, 14 and 15 accepted the Plan; that the Class 5 claim of John and Frances Williams was noted as "No claims"; and that the Class 16 Shareholder Class is deemed as a rejecting class because those interests are extinguished under the Plan.

The Class 1 Administrative Claims class was not provided unimpaired treatment and not all members of that class agreed to the payment of their claims in any manner but in full on the Effective Date. However, during the hearing, and as an aid to confirmation, the Bank agreed to guarantee the payment of all administrative claimants on the Effective Date, thus obviating the objections to the treatment of Class 1 Administrative Claims and satisfying the Section 1129 requirements as to that class.

The ballot report indicates that Class 14 accepted the Plan with three ballots accepting and two rejecting. However, objections were pending as to two additional claims. If those additional claims were allowed to vote, and even one voted to reject the Plan, Class 14 would be a rejecting class. Rather than have the court either estimate those claims or hold hearings on the objections to claims prior to confirmation, the debtor agreed to proceed at confirmation pursuant to Section 1129(b), as if the class had rejected.[4]

Class 14 is an impaired class and consists of all allowed general unsecured claims, except for certain unsecured claims arising from loans made to the debtor by the debtor's shareholders. Class 14 contains approximately fifty-one creditors, most of which are unsecured trade creditors.

_____

[3] Although the court does not agree that Class 2 has been afforded unimpaired treatment, that class has affirmatively accepted the Plan.

[4] There was one additional ballot cast by Himmelsbach Communications, Inc. which was not counted for the purpose of confirmation because it was late-filed and no motion to excuse the late filing was submitted. The parties agreed to allow the claim of Dana Connelly for distribution purposes only and to continue the hearing on the claim of Dennis Crocker.

The total amount of claims in Class 14 is approximately $711,861.37. Under the Plan, each claimholder in Class 14 will exclusively receive the proceeds from the sale of all 180 sewer taps, as well as any proceeds from avoidance actions, until each claimholder has recovered 50% of its claims. Once each claimholder in Class 14 has received 50% of its claims, the net proceeds from the sale of any remaining sewer taps and avoidance actions will be divided evenly between Classes 14 and 15.[5] Class 15 is also impaired and consists of all allowed unsecured claims arising from the shareholder loans. This class contains only eight creditors, but the total amount of claims is approximately $4,764,580.41. This class will receive title to Tract 16, an assignment by the debtor of the sewer service agreement, and 50% of any remaining proceeds from the sewer taps and avoidance actions after Class 14 has recovered 50% of its allowed claims. Finally, Class 16 is an impaired class and consists of the debtor's twelve shareholders. The Plan provides that Class 16 will not receive any distributions from the debtor on account of their equity interests unless and until all senior classes of claims have been paid in full.

The debtor's evidence primarily consisted of the testimony of Matthew Smith. Mr. Smith originally served as a consultant and advisor to the debtor before becoming its chief liquidating officer on February 7, 2012. Mr. Smith first explained the rationale for separately classifying the unsecured trade creditor claims and the shareholder loan claims. According to Mr. Smith, the unsecured trade creditors and shareholders had somewhat conflicting interests in the recovery of their claims. Mr. Smith testified that in his opinion trade creditors generally prefer that assets be

---

[5] The Plan also provides that Class 14 is to receive the remaining amount of proceeds from the sale of the property located at 390 Magnolia Drive SW–$31,472.42–after the convenience class of unsecured creditors recovers 35% of its claims.

liquidated expeditiously to achieve a swift recovery of their claims.  In contrast, the shareholders were primarily interested in retaining assets for a longer duration in an effort to maximize their recovery.

Mr. Smith testified it was the debtor's position that the assets given to Classes 14 and 15 were appropriate given their differing interests.  When the Plan was drafted, Mr. Smith and the debtor proceeded on the premise that the sewer taps were more liquid than Tract 16, and they felt that the taps were suitable for the interests and needs of the unsecured trade creditors because their liquidity would allow for a quicker recovery of their claims.  Tract 16 was thought to be less liquid as a piece of undeveloped real estate, but with greater potential to increase in value than the sewer taps over the long term.  Since the shareholders were in a position financially to delay the recovery of their claims, and had expressed a desire to delay recovery in order to allow the assets distributed to them under the Plan to increase in value,  Mr. Smith recommended that the debtor allocate to Class 15 the tract of undeveloped real estate.

The debtor introduced Exhibits 1 - 4 to illustrate through the testimony of Mr. Smith how much each class would likely recover as a percentage of their allowed claims under the Plan.[6]  The creditors within Class 14 could potentially receive as much as 77% and as little as 22% of their claims, depending on whether the disputed claims within Class 14 were allowed.[7]  The creditors

---

[6] The Exhibits set forth different scenarios dependent upon whether or not the disputed claims within Class 14 are allowed: one where neither of the two remaining disputed claims were allowed, one where both disputed claims were allowed, and then a scenario where one but not the other disputed claim was allowed.   See fn. 4.

[7] These percentages were based on Mr. Smith's assumptions that the sewer taps would sell for as low as $2,000 or potentially as high as $4,000, with $4,000 being the retail value of one sewer tap.

within Class 15 could potentially recover as much as 9% of their claims and as little as 5% of their claims.[8] Thus, according to Mr. Smith, under every possible scenario the Class 14 creditors would likely recover a greater percentage of their claims than the Class 15 creditors would recover. Mr. Smith also considered the possible recoveries if Classes 14 and 15 were consolidated with the assets and claims being combined into a single class. Mr. Smith testified that if this were to occur, all general unsecured creditors–the total number of creditors currently in Classes 14 and 15–would likely receive as much as 18% and as little as 10% on their claims. Therefore, the Class 14 creditors would more likely recover a greater percentage of their claims under the existing Plan than under a scenario where Classes 14 and 15 are combined.

However, the cross examination of Mr. Smith called into question the continuing validity of some of the assumptions made by the debtor regarding the liquidity of the sewer taps. Mr. Smith admitted that after evaluating the marketability of the sewer taps and determining that they would be the preferable source of funds for payment to Class 14 creditors, he learned that the sewer taps could only be sold in conjunction with lots sales in Sea Trail.[9] This limitation would affect both the price and timing of sales. As a result, Class 14 would potentially receive as low as 10% of their claims from the sale of sewer taps.[10] However that percentage recovery would yield the Class 14

---

[8] The percentages in Class 15 were based on a valuation of Tract 16 of $244,125, which was taken from the most recent appraisal conducted by the Bank, and on assumptions that Class 15 would share in the net proceeds from the sale of the sewer taps after Class 14 recovered 50% of their allowed claims.

[9] The individual sale of sewer taps was only one of three possible sales approaches contemplated by the debtor. A bulk sale to the proposed purchaser of the debtor's primary assets or to a separate investor were the other two means mentioned by the debtor.

[10] This scenario assumed that the sewer taps sold for only $2,000, as opposed to their $4,000 retail value, and that all disputed claims in Class 14 were allowed, which would dilute the recovery for each creditor's claims, thus presenting a worse case scenario for Class 14 claims.

creditors approximately 1% higher than that to be received by Class 15 creditors under the present plan and was roughly equivalent to what the Class 14 creditors would receive if both classes were combined.

At the close of evidence and arguments, the court took the matter under advisement to decide the following issues: (1) whether the debtor's disclosure statement contained adequate information; (2) whether the separate classification of Classes 14 and 15 was proper under the Code; (3) whether the disparate treatment between Classes 14 and 15 unfairly discriminated against Class 14; and (4) whether the Plan was fair and equitable with respect to Class 14.

## DISCUSSION

Section 1129 of the Code sets out the requirements for confirmation of a Chapter 11 plan. Pursuant to this section, for a plan to be confirmed the plan and the plan's proponent must comply with "the applicable provisions of this title."   11 U.S.C. § 1129(a)(1)–(2).  The "applicable provisions" include Section 1122 of the Code, which governs the classification of claims within a plan, as well as Section 1125 regarding the disclosure statement.  See In re Cajun Elec. Power Coop., Inc., 150 F.3d 503, 513 n.3 (5th Cir. 1998), cert. denied, 526 U.S. 1144, 119 S. Ct. 2019 (1999) (presuming that Sections 1129(a)(1) and (a)(2) require compliance with Section 1125); Mickey's Enters., Inc. v. Saturday Sales, Inc. (In re Mickey's Enters., Inc.), 165 B.R. 188, 193 (Bankr. W.D. Tex. 1994) ("In order to confirm a plan the court must find that the plan and its proponent have complied with the applicable provisions of Title 11. One of those applicable provisions is § 1125 which requires disclosure of 'adequate information.'"); see also In re Greate Bay Hotel & Casino, Inc., 251 B.R. 213, 223 (Bankr. D.N.J. 2000) (stating that the "applicable

provisions" include Section 1122); <u>In re Aspen Limousine Serv., Inc.</u>, 193 B.R. 325, 340 (D. Colo. 1996) (providing that Section 1129(a)(1) requires compliance with Section 1122).

      In addition to complying with the "applicable provisions" of Title 11, the proposed plan must also be accepted by all impaired classes of claims. 11 U.S.C. § 1129(a)(8). A plan that has rejecting impaired classes, however, may be confirmed over their rejection if the plan "does not discriminate unfairly, and is fair and equitable, with respect to" those classes. 11 U.S.C. § 1129(b)(1). This is commonly referred to as the "cram down" provision, and it requires a court to separately analyze whether the plan unfairly discriminates against any impaired rejecting classes and whether the plan is fair and equitable to those classes.

      The proponent of the plan "has the burden of establishing by a preponderance of the evidence that the plan complies with the statutory requirements for confirmation of Section 1129(a)." <u>In re Swartville, LLC</u>, 2012 Bankr. LEXIS 3809 (Bankr. E.D.N.C. 2012); <u>In re Atrium High Point Ltd. P'ship</u>, 189 B.R. 599, 609 (Bankr. M.D.N.C. 1995). If the case is nonconsensual, the proponent of the plan also has the burden of showing by a preponderance of the evidence that the requirements of Section 1129(b)(1) are met. <u>In re Smith</u>, 357 B.R. 60, 66 (Bankr. M.D.N.C. 2006); <u>In re Dow Corning Corp.</u>, 244 B.R. 696, 700 (Bankr. E.D. Mich. 1999), <u>aff'd</u>, 255 B.R. 445 (E.D. Mich. 2000). As expressed in the order entered on September 24, 2012, the court finds that the disclosure statement contains adequate information, that the separate classification of Classes 14 and 15 is proper, and that the Plan does not unfairly discriminate, and is fair and equitable to, Class 14.

## I.    Disclosure Statement

In order to solicit acceptances of a plan, the debtor must furnish all holders of claims or interests with the plan or a summary of the plan accompanied by a written disclosure statement. 11 U.S.C. § 1125(b). This disclosure statement must contain "adequate information," which is defined in Section 1125(a)(1) as:

> [I]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information.

Whether a disclosure statement contains adequate information is determined by the court on a case by case basis. In re Radco Props., Inc., 402 B.R. 666, 682 (Bankr. E.D.N.C. 2009) (citing In re A.H. Robins, Co., 880 F.2d 694, 696 (4th Cir. 1989). In any case, however, a proper disclosure statement should be "clear and succinct." Radco Props., 402 B.R. at 682. Courts have also acknowledged the underlying purpose of a disclosure statement, which is to provide creditors with enough information to "determine what distribution or other assets they will receive and also what risks they will face." In re Constr. Supervision Servs., Inc., No. 12-00569-8-RDD, 2012 Bankr. LEXIS 4564 at *4 (Bankr. E.D.N.C. October 1, 2012) (citing Nelson v. Dalkon Shield Claimants Trust (In re A.H. Robins Co.), 216 B.R. 175, 180 (Bankr. E.D. Va. 1997)). Accordingly, the statement should "provide the creditors with an accurate basis for determining their position and their ability to make an informed decision with regard to the acceptance or rejection of the [p]lan."

In re Newkirk, No. 11-05896-8-RDD, 2012 Bankr. LEXIS 977 at *8-9 (Bankr. E.D.N.C. March 9, 2012) (quoting In re Hendrix-Barnhill Co., Inc., No. 11-01974-8-RDD, 2011 Bankr. LEXIS 4521 at *9 (Bankr. E.D.N.C. Oct. 27, 2011)).

The disclosure statement supplied by the debtors in the instant case contains adequate information as required by Section 1125(b).  Among much other information, it provides a detailed summary of the history and business structure of the debtor, the events and actions taken by the debtor leading up to and during the bankruptcy, the circumstances surrounding the Agreed Order, the terms of the Agreed Order,  the legal issues relating to acceptance or rejection of the Plan, the legal issues relating to confirmation of the Plan, and the potential federal tax consequences of the Plan to the debtor.  More importantly, however, the statement incorporates the Plan itself and thus explains the proposed treatment for each class, including a detailed description of the assets that each class is to receive under the Plan.  All of these provisions were written in a clear, understandable and succinct fashion so that the parties, all of whom were relatively sophisticated individuals or entities, could make an informed decision as to whether they should accept or reject the Plan.  Therefore, the debtor's disclosure statement complies with Section 1125(b) and is approved.

## II.      Classification

Section 1122 of the Code provides little guidance as to how claims are to be classified.  In re Draiman, 450 B.R. 777, 790 (Bankr. N.D. Ill. 2011) (citing In re Nat'l/Northway Ltd. P'Ship, 279 B.R. 17, 25 (Bankr. D. Mass. 2002)).  Specifically, Section 1122(a) "does not expressly require that all substantially similar claims be placed in the same class, nor does it expressly prohibit substantially similar claims from being classified separately."  In re SM 104 Ltd., 160 B.R. 202, 216

(Bankr. S.D. Fla. 1993); <u>Draiman</u>, 450 B.R. at 790.  The Fourth Circuit has stated, however, that Section 1122 prohibits the separate classification of claims if "the plan unfairly creates too many or too few classes, if the classifications are designed to manipulate class voting, or if the classification scheme violates the basic priority rights. . . ." <u>In re Bryson Properties, XVIII</u>, 961 F.2d 496, 502 (1992); <u>see also</u> <u>In re Somerset Props. SPE, LLC</u>, 2012 Bankr. LEXIS 3867, at *6 (Bankr. E.D.N.C. 2012) ("[I]t is well-established that separate classification may not be created with the sole intent to achieve cram-down. . . .").

Although a classification scheme designed to manipulate voting is specifically prohibited, the debtor is still afforded some degree of flexibility in proposing a plan and has "considerable discretion to classify claims and interests according to the facts and circumstances of the case." <u>Bryson</u>, 961 F.2d at 502; <u>Somerset</u>, 2012 Bankr. LEXIS 3867, at *8.  A debtor may, therefore, separately classify claims as long as it is for a legitimate purpose other than to manipulate voting. <u>Bryson</u>, 961 F.2d at 502; <u>see also</u> <u>Somerset</u>, 2012 Bankr. LEXIS 3867, at *11-12 ("If a plan proponent can articulate legitimate differences among otherwise substantially similar claims . . . then separate classification may be proper.") (<u>citing</u> <u>In re Simon</u>, 2008 Bankr. LEXIS 2787, at *2 (E.D. Va. 2008));  <u>In re Orchards Vill. Invs.</u>, 2010 Bankr. LEXIS 48, at *18 (Bankr. D. Or. 2010) ("Similar claims generally are placed in the same class unless there are legitimate business or other reasons for separate classification.").

In the instant case, the debtor, through the testimony of Mr. Smith, has satisfied its burden of showing a legitimate reason for separately classifying Classes 14 and 15.   The two classes of unsecured creditors have different, and somewhat contradictory, interests.  Generally speaking, trade creditors are accustomed to short-term lending processes with an expectation of being repaid within

a relatively short time period.  See, e.g., Bruce A. Markell, A New Perspective on Unfair Discrimination in Chapter 11, 72 Am. Bankr. L.J. 227 (1998) (stating that "[t]rade creditors have short-term maturities" and they "understand the risk of selling goods on short-term credit. . . ."); see also In re Greate Bay Hotel & Casino, Inc., 251 B.R. 213, 232 (Bankr. D.N.J. 2000) (agreeing with Professor Markell's analysis of trade creditor expectations regarding short-term credit).  The shareholders in the instant case have expressed a willingness to accept property pursuant to the Plan which may have to be held for some time to maximize its value for distribution.  Such a position is somewhat inconsistent with the presumed wishes and expectations of the general unsecured trade creditor class.  Thus there are certainly legitimate differences between the two classes of claimholders which justify separate classification.

The Committee and the Bankruptcy Administrator argue that the purported reason for the separate classification–to provide a quicker recovery for trade creditors while allowing the shareholder creditors to retain assets for a longer duration–is negated by the possibility that the sewer taps are not as liquid as once thought to be.  Regardless of the actual liquidity of the assets, however, the fact of the matter is that Classes 14 and 15 still have inconsistent interests.  Creating two separate classes enables the debtor to satisfy, or at least attempt to satisfy, the different interests at play by providing each class with distinct treatment that is intended to be suitable for the needs and expectations of the creditors within their respective class.  The suggested alternative, i.e., combining the two classes into a single class, may result in internal conflict among members of such combined class because those creditors would most likely disagree as to the timing and methods for liquidating the assets.  See 11 U.S.C. § 1123(a)(4) (requiring a plan to provide the same treatment for each claim in a particular class); see also In re New Jersey Medical Center, 817 F.2d 1055, 1061

13

(3d Cir. 1987) ("Section 1123(a)(4) only requires equality of treatment of claims . . . placed in the same class").   Separate classification, therefore, increases the likelihood for a successful reorganization, and the debtor is given the flexibility under the Code to separately classify similar claims for this purpose.   Cf. In re Deep River Warehouse, Inc., 2005 Bankr. LEXIS 1793, at *15 (Bankr. M.D.N.C. 2005) ([I]t must be observed that, in the Fourth Circuit, the separate classification of even substantially similar claims is permissible if the debtor can offer any reason 'which will withstand scrutiny,' which means *not* 'for the purpose of manipulating voting.'" (quoting Bryson, 961 F.2d at 502).

## III.    1129(b)(1) Unfair Discrimination

Courts have developed different tests for determining whether a reorganization plan unfairly discriminates against a class in violation of Section 1129(b)(1).   See 7 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 1129.03[3][a] (16th ed. rev. 2012) (describing the various tests). These tests range from a rigid, mechanical approach in which almost any form of discriminatory treatment violates Section 1129(b)(1) to a broad, flexible one in which the outcome depends heavily on the facts and circumstances of each case.   See Denise R. Polivyal, Unfair Discrimination in Chapter 11: A Comprehensive Compilation of Current Case Law, 72 Am. Bankr. L.J. 191, 199-203 (1998) (providing overview of different approaches to unfair discrimination analysis).

The Fourth Circuit has embraced a test that takes a four-part inquiry originally used to assess fairness under Section 1322(b)(1) of the Code and applies it to Section 1122(b)(1).[11]   See Ownby

---

[11] There have been numerous tests created for the unfair discrimination analysis, but the four-part test acknowledged by the Fourth Circuit has been adopted by many courts.  See, e.g., In re Union Fin. Servs. Group, Inc., 303 B.R. 390 (Bankr. E.D. Mo. 2003); In re Am. HomePatient, Inc., 298 B.R. 152 (Bankr. M.D. Tenn. 2003); In re Aztec Co., 107 Bankr. 585, 590 (Bankr. M.D. Tenn. 1989). Another prevailing test is one that creates a rebuttable presumption that a plan is unfairly

v. Jim Beck, Inc. (In Re Jim Beck, Inc.), 214 B.R. 305, 307 (W.D. Va. 1997), aff'd per curiam, No. 97-2701, 162 F.3d 1155, 1998 U.S. App. LEXIS 20736 (4th Cir. Aug. 24, 1998) (unpublished table decision); In re Sutton, 2012 Bankr. LEXIS 752, at *6-7 (Bankr. E.D.N.C. 2012); but see In re Prosperity Park, LLC, 2011 Bankr. LEXIS 1852, at *9 (Bankr. W.D.N.C. 2011) (applying a rebuttable presumption test rather than the four-part test). This test consists of the following four factors:

> (1) whether there is a reasonable basis for the discrimination; (2) whether the plan can be confirmed and consummated without the discrimination; (3) whether the discrimination is proposed in good faith; and (4) the treatment of the classes discriminated against.

Jim Beck, 214 B.R. at 307; see also In re Aztec Co., 107 Bankr. 585, 590 (Bankr. M.D. Tenn. 1989).

When applying this test, a court must weigh the four factors by looking at all of the facts and circumstances of each individual case. As the Fourth Circuit has stated, whether a plan is unfairly discriminatory requires a "totality of circumstances" type of analysis. Bryson, 961 F.2d at 502 n.9. Ultimately, the responsibility of the court is to examine the disparate treatment that exists within a proposed plan, if any, and to determine whether the discrimination is justified under the Code. See Resnick & Sommer, supra, ¶ 1129.03[3][a].

Regardless of which test courts use to determine whether a plan is unfairly discriminatory, it is important to clarify that Section 1129(b)(1) permits discriminatory treatment as long as the discrimination is not unfair. See In re LeBlanc, 622 F.2d 872, 879 (5th Cir. 1980) ("A bankruptcy court can permit discrimination when the facts of the case justify it."); In re Renegade Holdings, Inc., 429 B.R. 502, 521 (Bankr. M.D.N.C. 2010), reh'g granted, 2010 Bankr. LEXIS 2252 (Bankr.

---

discriminatory if several requirements are satisfied. See In re Dow Corning Corp., 244 B.R. 696, 702 (Bankr. E.D. Mich. 1999).

M.D.N.C. 2010) ("The prohibition under section 1129(b)(1) is against 'unfair discrimination' and not simply discrimination of any kind."); In re Crosscreek Apts., 213 B.R. 521, 537 (Bankr. E.D. Tenn. 1997) ("[D]iscrimination in the treatment of classes is permissible so long as it is not unfair."); Aztec, 107 Bankr. at 589 ("Section 1129(b)(1) prohibits only unfair discrimination, not all discrimination.").  To hold that any degree of disparate treatment among similarly situated classes violates Section 1129(b)(1) would "threaten[] the vitality of the word 'unfairly' in [Section] 1129(b)(1)."  Aztec, 107 Bankr. at 589.

Consistent with the Code's requirement for unfairness, courts often conclude that a plan is unfairly discriminatory when there is a large discrepancy in the percentage recovery between similarly situated creditors.  See, e.g., In re Tuscon Self-Storage, Inc., 166 B.R. 892 (9th Cir. BAP 1994) (finding unfair discrimination when plan provided 100% recovery for unsecured trade creditors and 10% to deficiency claim); In re Sentry Operating Co. of Tex., Inc., 264 B.R. 850, 863-64 (Bankr. S.D. Tex. 2001) (finding unfair discrimination when plan provided for 100% recovery for one class of unsecured creditors and 1% recovery to another class of unsecured creditors); In re Barney & Carey Co., 170 B.R. 17 (Bankr. D. Mass. 1994) (finding unfair discrimination when plan paid deficiency claims 100% over ten years and paid trade creditors only 15% of claims within ninety days); Aztec, 107 B.R. at 589 (finding unfair discrimination when plan paid insider unsecured claims in full while paying nonrecourse deficiency claim only 3%).  However, courts have been less likely to find that a plan is unfairly discriminatory when the percentage recovery of claims is relatively close.  See, e.g., Greate Bay Hotel, 251 B.R. at 231-32 (applying rebuttable presumption test and finding that plan was not unfairly discriminatory even though one class only recovered 76% of its claims while another similarly situated class recovered 80% of its claims).  A crucial

16

distinction, therefore, between cases in which plans have been determined to be unfairly discriminatory and those that have not is the magnitude of the difference in the amount of recovery between similarly-situated classes.

The court will begin its analysis by examining the actual treatment given to the unsecured trade creditors within Class 14.  This factor, while not dispositive, weighs strongly in favor of the debtor and towards a conclusion that the Plan does not unfairly discriminate against Class 14.  The debtor's evidence demonstrated that the Class 14 creditors will likely receive a greater percentage of their claims than the Class 15 creditors.  The Class 14 creditors are also likely to receive a greater percentage of their claims under the present Plan than they would if Classes 14 and 15 were consolidated into one class.  While it is clear that the Plan discriminates between Classes 14 and 15, it is far from clear how this particular discrimination is at all unfair.  As previously stated, most courts conclude that a plan is unfairly discriminatory when a large discrepancy exists between the percentage recovery that the similarly-situated classes receive.  In the instant case, however, the discrepancy, if there is any, seems to be slight and could potentially benefit the Class 14 creditors.  Accordingly, the actual treatment given to Class 14 under the Plan, once compared to the alternative forms of treatment, strongly suggests that the discrimination within the Plan is not unfair.

The discrimination between Classes 14 and 15 is also supported by a reasonable basis.  As previously explained, the somewhat inconsistent interests between the two classes will likely affect the manner in which each class desires to dispose of the assets distributed to it under the Plan. The inconsistent interests justify classifying the creditors separately as well as providing each class with different treatment. See Denise R. Polivyal, Unfair Discrimination in Chapter 11: A Comprehensive Compilation of Current Case Law, 72 Am. Bankr. L.J. 191, 198-99 (explaining how several courts

17

have recognized that the reasons justifying separate classification oftentimes justify different treatment given to each class); see also, e.g., In re Johnston, 21 F.3d 323, 328 (9th Cir. 1994) (stating that the plan's classification scheme satisfied the unfair discrimination test because the reasons for classification were reasonable and nondiscriminatory reasons); In re Rivers End Apartments, 167 B.R. 470, 487 (Bankr. S.D. Ohio 1994) (stating that reasons for separate classification of nonrecourse deficiency claims and other unsecured claims seem to more appropriately support reasons for differing treatment).

The evidence also demonstrates that the discrimination between Classes 14 and 15 was proposed in good faith. Mr. Smith, the debtor's chief liquidating officer, testified that he and the debtor genuinely believe that treating the unsecured trade creditors differently from the shareholder creditors is not only fair to each party, but it also enhances the debtor's ability to successfully reorganize. This testimony was corroborated by the evidence indicating that Class 14 is better off with its current treatment under the Plan than it would be with the suggested alternative forms of treatment. At the confirmation hearing, the Committee asserted a lack of good faith but did not produce much, if any, evidence to support these allegations. While the cross-examination of Mr. Smith may have undercut the accuracy of the assumptions regarding Class 14's treatment, it alone is insufficient to infer a lack of good faith. The assumptions made by the debtor regarding the liquidity of the sewer taps were made in good faith, even if later found to be less factually sound. The evidence collectively shows that the discrimination between Classes 14 and 15 was intended to, and may in fact, benefit both classes and was proposed in good faith.

Finally, although an inquiry into whether the discrimination is necessary for the reorganization seems to weigh in favor of a conclusion that the Plan is unfairly discriminatory, it is

certainly not outcome determinative.  The debtor has shown that separate classification facilitates a successful reorganization, but  has not established that the Plan would fail if the two classes were consolidated and given the same treatment.  However, simply because the reorganization may be possible without the proposed discrimination does not necessarily render the Plan unfairly discriminatory, particularly when the debtor has demonstrated that the Class 14 creditors will likely be better off with the different treatment than without it.  Although the Class 14 and 15 creditors are similarly situated in that they are all unsecured creditors, there is a significant disparity in the amount owed to each class of creditors.  If a plan proponent can produce evidence demonstrating that different treatment between similarly situated, albeit unalike, creditors results in more equitable treatment for those creditors, as the debtor in this case has done, a plan should not automatically become unfairly discriminatory because a reorganization without the discrimination may theoretically be possible.[12]  In light of the unique circumstances of this case, the finding that the discrimination is not absolutely necessary for the reorganization is far outweighed by the findings with respect to the other factors of the four-part test.

## IV.    Fair and Equitable

To be fair and equitable with respect to a dissenting class of unsecured claims, a plan must, at a minimum, comply with the specific requirements set forth in Section 1129(b)(2)(B).  In re

---

[12] The requirement that the discrimination be necessary for the reorganization, adhered to by some courts,  has actually been criticized by scholars and other courts.  In his article A New Perspective on Unfair Discrimination in Chapter 11, Professor Bruce A. Markell is highly critical of any test that in some way requires the discrimination to be necessary for a reorganization. 72 Am. Bankr. L.J. 227, 254 (1998).  He states that such a requirement is "fatally flawed" because "discrimination is never necessary" in that "[a]ny nonindividual Chapter 11 case theoretically is capable of confirmation through plans which do not discriminate."  Id.; see also Dow Corning, 244 B.R. at 702 (stating that Markell's critiques of the four-part test and similar versions of it are well-founded, particularly his criticism of the necessity requirement).

Maharaj, 449 B.R. 484, 491 (2011), aff'd, Maharaj v. Stubbs & Perdue, P.A., 681 F.3d 558 (4th Cir. 2012).  With regard to a class of unsecured creditors, a plan may satisfy these requirements by providing that each holder of a claim within the dissenting class of unsecured claims "receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim."  11 U.S.C. § 1129(b)(2)(B)(i).  Alternatively, a plan may provide that the holder of any claim or interest that is junior to the claims of a dissenting class of unsecured creditors will not receive or retain any property under the plan on account of such junior claim or interest.  11 U.S.C. § 1129(b)(2)(B)(ii).  This latter requirement, which is at issue in this case, is commonly referred to as the absolute priority rule.  Maharaj, 449 B.R. at 491.  This rule requires all unsecured creditors within a dissenting class to be paid in full before any junior claims or interests receive or retain any property under the plan.  Id.

    The Committee argues that the circumstances in the instant case are analogous to those in Bryson in which the Fourth Circuit held that the debtor's proposed plan violated the absolute priority rule.  See Bryson, 961 F.2d at 504-05.  In Bryson, the plan provided the debtor's equityholders with the exclusive right to contribute new capital and the right to a return of the new capital while a senior class only recovered 3.5% of its unsecured deficiency claim.  Id. at 504.  The court stated that the exclusive right to contribute new capital constituted "property" under Section 1129(b)(2)(B)(ii), which was "received or retained on account of a prior interest."  Id.  Since a senior class of unsecured creditors was not being paid in full, the court held that the plan violated the absolute priority rule because the equityholders had received or retained property on account of a junior interest.  Id.

The shareholders who loaned money to the debtor pre-petition comprising Class 15 are given the exclusive right to Tract 16 under the Plan and are thus clearly receiving "property" under Section 1129(b)(2)(B)(ii). However, in contrast to the equityholders in Bryson, they are not receiving or retaining this property on account of their equity, i.e., a junior claim or interest. Rather, the shareholders in Class 15 are receiving this property based on their legal status as unsecured creditors of the debtor. Additionally, the unsecured claims within Class 15 are not junior to the unsecured claims within Class 14, and therefore providing Class 15 with property even though Class 14 will not be paid in full, does not implicate the absolute priority rule.

Finally, Class 16 is a separate class comprising all equity interests in the debtor. The Plan provides that this class will not receive any distributions on account of their equity interests until all senior classes have been paid in full. Accordingly, the Plan does not violate the absolute priority rule because the shareholders within Classes 15 and 16 are not receiving any property based on a junior claim or interest, and the Plan is fair and equitable to Class 14.

## CONCLUSION

The court concludes that the  disclosure statement provides adequate information, and that the Plan properly classifies the claims of the unsecured trade creditors and the shareholder creditors into separate classes. The court also concludes that the Plan does not unfairly discriminate against, and is fair and equitable to, the unsecured trade creditors within Class 14. The Plan is therefore confirmed.

**SO ORDERED**

**END OF DOCUMENT**